[Cite as *In re M.D.*, 2022-Ohio-2672.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE M.D., ET AL.                   :
                                     :        Nos. 110957, 110958,
Minor Children                       :        and 110959
                                     :
[Appeal by T.H., Mother]             :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:**  August 4, 2022

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD-17900994, AD-19903792, and AD-20908704

---

### *Appearances:*

Scott J. Friedman, *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Appellant, Mother, appeals three orders of the Cuyahoga County Court
of Common Pleas, Juvenile Division, granting permanent custody of her three

children, M.D., J.K., and I.S.,[1] to the Cuyahoga County Division of Child and Family Services ("CCDCFS" or "the agency"). She claims the following error:

> The juvenile court erred in terminating the appellant's parental rights, in violation of her rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 2} We affirm the juvenile court's judgment.

## I. Facts and Procedural History

{¶ 3} CCDCFS filed three separate complaints; one for each child. The case originated with the filing of a complaint for the oldest child, M.D., in January 2017. Two additional complaints were followed in 2019 and 2020, seeking temporary custody of J.K. and I.S. at the times of their births. The children were each adjudicated dependent and placed in the temporary custody of CCDCFS. I.S. was also adjudicated neglected.

{¶ 4} CCDCFS developed a case plan for Mother with the goal of reunifying her with her children.[2] The case plan was designed to address Mother's issues with mental health, housing, anger management, and domestic violence. Mother appeared to be making progress on the case plan in late 2018, and CCDCFS implemented overnight visitation with M.D., who was the only child born at that time. The overnight visits were stopped, however, when CCDCFS learned of ongoing

---

[1] The parties are referred to herein by their initials or title in accordance with this court's established policy regarding non-disclosure of identities in juvenile cases.

[2] This appeal is brought by the children's mother. We, therefore, focus on the evidence relevant to Mother's rights with the respect to the children. The children's fathers are not parties to this appeal.

abuse and domestic violence in the home. (Aug. 24, 2021, tr. 98-99, 115-116.) The agency later concluded that Mother failed to significantly remedy the issues that caused the children to be placed in temporary custody, and CCDCFS moved to modify temporary custody of the children to permanent custody.

{¶ 5} The juvenile court held a hearing on the motions to modify temporary custody over the course of two days; August 24, 2021, and September 13, 2021. Two CCDCFS social workers assigned to this case testified that Mother's mental instability and difficulty regulating her emotions were the primary reasons the agency sought permanent custody of the children. (Aug. 24, 2021, tr. 96, 108, 164, 167.) Mother had been hospitalized several times due to her mental condition, and she had attempted suicide at least twice. (Aug. 24, 2021, tr. 19.) Betsy Boyle ("Boyle"), a social worker at Marymount Hospital where Mother was admitted following her second suicide attempt in March 2020, testified that Mother, who was pregnant at the time, had attempted to kill herself and her unborn baby. While she was in the hospital, Mother threatened to harm another patient and threatened to beat up Boyle. (Aug. 24, 2021, tr. 20.)

{¶ 6} Mildred Tate ("Tate"), a child protection specialist with CCDCFS, testified that in June 2021, she attended a supervised visit with Mother and her children on behalf of the social worker assigned to the case. During the visit, Mother became agitated when Tate made parenting suggestions. (Aug. 24, 2021, tr. 37.) Mother started screaming profanity and making threats. Security guards came to the scene and escorted Mother out of the building. (Aug. 24, 2021, tr. 40.) Marcus

Allen, one of the protective services officers with the Cuyahoga County Sheriff's Office who responded to the scene, testified that Mother was "hostile," and threatened to beat the officers "bloody to the ground." (Aug. 24, 2021, tr. 52.) This incident occurred less than three months before the permanent custody hearing.

{¶ 7} Frontline Services is a nonprofit organization that assists individuals with housing, mental health, and suicide prevention. Caleb Dixon ("Dixon"), a program manager at Frontline Services, testified that he performed an assessment of Mother's needs and found that she had a history of 20 hospitalizations. (Aug. 24, 2021, tr. 60.) According to Dixon, Mother, who had been in foster care as a child herself, had a history of trauma and a strong mistrust of people. She also had difficulty regulating her emotions. (Aug. 24, 2021, tr. 61.) Dixon recommended that Mother receive counseling and psychiatric treatment. (Aug. 24, 2021, tr. 64.) Treveya Franklin, who worked with Mother at Frontline Services, described an incident in which Mother became "agitated with staff" and refused to leave the lobby. Ultimately, police were called to remove her. (Aug. 24, 2021, tr. 72.)

{¶ 8} Pamela Roy ("Roy"), who is now a supervisor with CCDCFS, was assigned to the case from September 2018 through February 2020. Roy testified there were several objectives in Mother's case plan, but the primary goal was stabilizing her behavior because she had "explosive behaviors." (Aug. 24, 2021, tr. 96.) Roy explained that Mother became defensive anytime anyone offered parenting advice. Yet, according to Roy, Mother never reached a point where parenting instruction was not warranted. (Aug. 24, 2021, tr. 97.)

{¶ 9} Nevertheless, Mother made improvements in 2018 to the point that she progressed from supervised visits to unsupervised visits and eventually started having overnight visits with M.D. in late 2018. The unsupervised visits were stopped, however, when Roy learned that domestic violence was a problem in Mother's home. Mother admitted that "her home was unsafe" and reported at a "staffing"[3] that her father and uncle were entering her home and abusing her. (Aug. 24, 2021, tr. 99.) The agency was also concerned about domestic violence involving Mother and one of the fathers of Mother's children. (Aug. 24, 2021, tr. 98.)

{¶ 10} Roy referred Mother to Able Counseling for anger-management counseling, and Mother told Roy she was engaging in the anger-management program. However, when Roy inquired at Able Counseling regarding Mother's participation in the program, she was told Able Counseling "didn't have any programming for her." (Aug. 24, 2021, tr. 106.) Roy testified that after one and one-half years of services, Mother had not made enough progress to begin reunification with her children. (Aug. 24, 2021, tr. 108.)

{¶ 11} Michelle McCracken ("McCracken"), a social worker with CCDCFS, took over as the case manager following Roy's reassignment. McCracken testified that Mother often failed to appear for supervised visits with the children. As a result,

---

[3] According to the Cuyahoga County Division of Child and Family Services Policy Statement, the term "staffing" refers to a team decision-making process that involves birth or adoptive families, service providers, community members, and agency staff to assure the best possible placement for children in temporary or permanent custody. *In re E.Z.*, 8th Dist. Cuyahoga Nos. 103728 and 103966, 2016-Ohio-5412, ¶ 9, fn. 1.

Mother was required to give notice that she would be present the day before a scheduled visit. If Mother failed to give prior notice, the visit was automatically canceled. (Aug. 24, 2021, tr. 155.)

{¶ 12} McCracken testified that although Mother completed anger-management classes, she continued to have fits and failed to control her emotions. McCracken described Mother's outburst with Tate when protective services were required to escort her out of the building as an example of an outburst that occurred after Mother had completed anger-management classes. Thus, McCracken concluded that Mother had not benefitted from the classes and "hasn't demonstrated a change in behavior." (Aug. 24, 2021, tr. 164.)

{¶ 13} CCDCFS also required that Mother complete a mental-health assessment in order to assess her mental stability. (Aug. 24, 2021, tr. 164.) Mother told McCracken that an assessment had been done and that she would provide McCracken with a copy, but McCracken never received it. (Aug. 24, 2021, tr. 164.)

{¶ 14} Mother signed releases to allow CCDCFS to obtain information from her service providers, but each time she signed a release, she often revoked it before the agency could obtain any information.[4] (Aug. 24, 2021, tr. 156.) McCracken explained that without releases, she was not authorized to discuss Mother's progress with service providers and was, therefore, unable to determine if Mother was making progress or needed additional services. McCracken explained:

---

[4] Although Mother may have revoked releases authorizing the agency to obtain confidential information from her service providers, the record shows that the agency obtained information from Frontline Services, and other service providers.

[I]f I can't talk to the provider about exactly what services mom is getting and if I can't get copies of the assessment to see what mom is telling them so that I can have conversation with them and share with them some of the things that I've seen and some of my concerns, then I don't feel that mom's getting the proper or most adequate counseling and mental health services if they're only doing services based on what mom is telling them and not anybody else.

As Miss Ray testified here, it's kinda like mom doesn't want anybody to know her bad stuff, so she tells them the good stuff because from us, we disclose it all.

(Aug. 24, 2021, tr. 166-167.) Ultimately, McCracken concluded that Mother had not "demonstrated a behavior change enough to be able to reunify or place the children with [her]." (Aug. 24, 2021, tr. 177.)

{¶ 15} Carla Golubovic ("Golubovic"), the children's guardian ad litem ("GAL"), agreed that the children should not be reunified with Mother. At the hearing, Golubovic explained:

[M]y concern for the three children, should they be returned to the mother's care and control, is her mental health stability.

I've been associated to this case since [M.D.] was an infant.

Initially, M.D. remained in the care of her mother and was subsequently removed, placed into temporary custody, and then mother had two subsequent children, that being [J.K.] and [I.S.].

Since my association to this family in total mother has had multiple psychiatric hospitalizations.

Mother's [sic] went from provider to provider, has not had any consistency, has not had stability for any length of time such that I would be comfortable with returning her three daughters to her care and control.

Based on her own testimony here today the only person that she sees for mental health is Cynthia Holtzman of Ohio Guidestone, and Miss Holtzman testified that she's a therapist at Ohio Guidestone, conducts

telehealth meetings with mother that are now bi-weekly and it's a self-report.

* * *

Your Honor, mother has a lot of positives. I believe she's a very resourceful woman and again, very committed to her children, but I'm concerned about the status of her mental health, her ability to be consistent in managing mental health, even having insight as to what her mental health conditions are and maintaining stability and consistency for her children.

We heard that some visitations that have taken place have escalated in bringing in law enforcement.

Even on today's date mother doesn't appear to have much insight as to being reflective looking back and thinking there was a better way to handle situations, so that's very concerning.

And I don't believe that she has the capacity to properly parent these children, so my recommendation is permanent custody.

(Sept. 13, 2021, tr. 351-352.)

{¶ 16} Following the hearing, the court issued judgments in the three separate cases granting permanent custody of the children to CCDCFS. In reaching each of the judgments, the court observed that Mother "failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home." The court also noted that Mother's "chronic mental illness, chronic emotional illness, and chemical dependence"[5] prevented Mother from providing an appropriate home for the children. Finally, the court found that

---

[5] As explained in our analysis of the evidence, the record supports the juvenile court's finding that Mother had chronic mental illness and emotional illness but does not support the court's finding that Mother was troubled by chemical dependency.

Mother failed to regularly visit with her children and that Mother abandoned and neglected J.K. and I.S. Mother now appeals the trial court's judgments.

## II. Law and Analysis

{¶ 17} In the sole assignment of error, Mother argues the trial court erred in terminating her parental rights, in violation of her rights under the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

{¶ 18} A parent has a "fundamental liberty interest * * * in the care, custody, and management of [his or her child]." *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Indeed, the termination of parental rights is regarded as "'the family law equivalent of the death penalty in a criminal case.'" *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffm*an, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. Consequently, parents "'must be afforded every procedural and substantive protection the law allows.'" *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

{¶ 19} Nevertheless, a parent's right to the care and custody of his or her child is not absolute. *In re L.G.*, 8th Dist. Cuyahoga No. 110789, 2022-Ohio-529, ¶ 49. "'[T]he natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principal to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 20} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 21} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the second prong of the analysis requires the juvenile court to determine, by clear and convincing evidence, whether it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 22} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains

some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16. "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

{¶ 23} With respect to the first prong of the permanent-custody analysis, the juvenile court made a finding in M.D.'s case, pursuant to R.C. 2151.414(B)(1)(d), that "[t]he child has been in temporary custody of the Cuyahoga County Division of Child and Family Services * * * for twelve (12) or more months of a consecutive twenty-two (22) months period." Specifically, the court found in its judgment entry dated September 30, 2021, that the child had been in custody since April 6, 2017.

{¶ 24} The court also made a finding in each child's case, pursuant to R.C. 2151.414(B)(1)(a), that the children could not be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E) provides a list of factors the court must consider in determining whether or not children can be placed with a parent within a reasonable time. As relevant here, the court found, pursuant to R.C. 2151.414(E)(1), that

> notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child[ren] to be placed outside the home, the [parents] have

failed continuously and repeatedly to substantially remedy the conditions causing the child[ren] to be placed outside the child[ren]s home.

{¶ 25} Evidence at the hearing established that Mother had ongoing mental health and anger-management issues that affected her ability to adequately parent the children. McCracken testified that although Mother completed anger-management classes, she continued to have inappropriate outbursts and failed to control her emotions. For example, Mother was escorted out of the building where she was having a supervised visit with her children because she lost control when Tate offered parenting advice. During the incident, Mother threatened Tate and told the protective services officers who responded to the scene that she would beat them "bloody to the ground." Because the incident occurred after Mother had completed anger-management classes, McCracken concluded that Mother did not benefit from the instruction because her behavior remained unchanged. (Aug. 24, 2021, tr. 164.)

{¶ 26} McCracken also testified that Mother failed to provide proof that she completed a mental assessment and although she signed releases to allow CCDCFS social workers to discuss her case with service providers, she often revoked the authorizations, which prevented the agency from exchanging relevant information that could assist in Mother's treatment. (Aug. 24, 2021, tr. 156, 166-167.) McCracken testified that, at time of trial, Mother had not demonstrated enough of a behavior change to allow reunification of the children with her. (Aug. 24, 2021, tr. 167.) The GAL also testified that the children could not be placed with Mother within a reasonable time. (Sept. 13, 2021, tr. 351-352.)

{¶ 27} The juvenile court found, pursuant to R.C. 2151.414(E)(2), that the children could not be placed with Mother within a reasonable time due to her chronic mental illness. Evidence showed that Mother had 20 mental health related hospitalizations, including at least three hospitalizations in 2018 and one hospitalization in 2020 related to a second suicide attempt while Mother was pregnant with I.S. (Aug. 24, 2021, 18-20, 25, 59-60, 101-102, 198-199.) Mother's ongoing struggle with mental health manifested in erratic and volatile behavior during which she threatened to harm a patient in the hospital, hospital staff, agency staff, and protective services officers. (Aug. 24, 2021, tr. 18-28, 37-47, 50-55, 72-75, 111, 149.) The GAL testified that the children could not be placed in Mother's care primarily because of Mother's lack of mental stability. (Sept. 13, 2021, tr. 350.)

{¶ 28} The juvenile court also found that the children could not be placed in Mother's care within a reasonable time due to ongoing neglect caused by Mother's "failure to regularly visit the child[ren]." Although Mother visited the children, there were also extended periods of time without visitation. McCracken testified that Mother had no contact with the children from March 2021 through August 2021. (Aug. 24, 2021, tr. 153.) McCracken explained that the agency established a rule whereby Mother was required to notify the agency the day before a scheduled visit of her intent to appear for the visit because she often failed to show for scheduled visits. (Aug. 24, 2021, tr. 155.) Therefore, the trial court's finding that Mother neglected the children by failing to regularly attend scheduled visits is supported by

the evidence, and the juvenile court properly found that the first prong of the permanent-custody analysis was established by the evidence.

{¶ 29} With respect to the second prong of the permanent-custody analysis, we recognize that, given the nature of the proceeding and the impact the court's decision will have on the lives of the parties concerned, the juvenile court enjoys broad discretion in determining whether an order of permanent custody is in the child's best interest. *In re Aw*kal, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994). We, therefore, review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47.

{¶ 30} "A court abuses its discretion when a legal rule entrusts a decision to a judge's discretion and the judge's exercise of that discretion is outside of the legally permissible range of choices." *State v. Hackett*, 164 Ohio St.3d 74, 2020-Ohio-6699, 172 N.E.3d 75, ¶ 19. An abuse of discretion may be found where a trial court "applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). When applying the abuse of discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 31} In determining the best interests of a child, the juvenile court must consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 32} Although a juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1) in making a determination regarding permanent custody, "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31. Moreover, only one factor needs to be resolved in favor of permanent custody in order to find that permanent custody is in the child's best interest. *In re S.C.*, 8th Dist. Cuyahoga No. 102350, 2015-Ohio-2410, ¶ 30.

{¶ 33} Mother does not challenge the court's best interest of the child determination directly. She argues instead that she met most of the objectives outlined in her case plan and that she substantially remedied the conditions that required removal of the children. While it is true that Mother obtained housing and completed several aspects of her case plan, including anger-management classes and parenting classes, the evidence showed that the problematic behaviors remained unchanged. (Aug. 24, 2021, tr. 164.) Moreover, the evidence supports the court's finding that permanent custody is in the children's best interests.

{¶ 34} With respect to the "relationship" factor listed in R.C. 2151.414(D)(1), the evidence showed that Mother was not well bonded to the children. As previously stated, Mother often missed visits with the children and went long periods of time without any contact with them. Even when Mother attended visits, McCracken was concerned the children were not bonding with their mother. (Aug. 24, 2021, tr. 171.) By contrast, McCracken testified that the children, who are together in the same foster home, have a good relationship with their foster mother. (Aug. 24, 2021, tr. 176.)

{¶ 35} As relevant to the "children's wishes" factor listed in R.C. 2151.414(D)(1)(b), the GAL testified that the children were each too young to express their wishes, and she recommended that permanent custody would be in their best interests. (Sept. 13, 2021, tr. 352.) "'The juvenile court properly considers the GAL's recommendation on the permanent-custody motion as part of the R.C. 2151.414(D)(1)(b) analysis where the children are too young to express their

wishes.'" *In re R.A.*, 8th Dist. Cuyahoga No. 110541, 2021-Ohio-4126, ¶ 52, quoting *In re B/K Children*, 1st Dist. Hamilton No. C-190681, 2020-Ohio-1095, ¶ 45.

{¶ 36} R.C. 2151.414(D)(1)(c) involves consideration of the custodial history of the child. At the time of trial, M.D. had been in agency custody for over four years (all but the first few months of her life). (Aug. 24, 2021, tr. 103-104, 112-113, 131, 143.) The other two children had been in agency custody their entire lives. Indeed, Mother acknowledged at trial that she had never had the children in her home. (Sept. 13, 2021, Tr. 322.) The custodial history demonstrated that the children were in need of a permanent placement. And, as previously explained, the children could not be reunified with Mother within a reasonable time and no alternative to permanent custody was presented at trial. Therefore, the evidence at trial established that permanent custody was in the children's best interests.

{¶ 37} We recognize that Mother made an effort to complete her case plan and that she genuinely cares for her children. However, the evidence at trial supports the court's findings that the children could not be reunified with Mother within a reasonable time and that permanent custody was in the children's best interests. According, the sole assignment of error is overruled.

{¶ 38} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

ANITA LASTER MAYS, P.J., and
CORNELIUS J. O'SULLIVAN, JR., J., CONCUR