[Cite as *In re Y.T.*, 2026-Ohio-2094.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE Y.T.                                               :

                                                          No. 115933
A Minor Child                                            :

[Appeal by B.C., Mother]                                :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 4, 2026

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD 24903970

---

### *Appearances:*

Christina M. Joliat, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

EMANUELLA D. GROVES, P.J.:

{¶ 1} Appellant-mother B.C. ("Mother") appeals from the juvenile court's judgment granting permanent custody of her minor child, Y.T., to appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following sole assignment of error for review:

The trial court's order granting permanent custody to the agency was against the manifest weight of the evidence and it erred in finding permanent custody to be in the best interest of the child.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Mother is the biological parent of Y.T. born in 2024. At the time of this appeal, paternity has not been established and no potential father has been identified.

{¶ 4} An ex-parte order was issued on April 23, 2024, committing Y.T. to the emergency custody of CCDCFS due to Mother's past history of mental-health issues. The following day, CCDCFS filed a complaint for dependency and permanency on the same basis. CCDCFS further noted that Y.T.'s siblings had previously been adjudicated neglected and dependent and had been placed in the legal custody of relatives. The juvenile court issued a predispositional temporary-custody order in favor of CCDCFS on April 25, 2024.

{¶ 5} The juvenile court held a hearing on the complaint on June 27, 2024 and adjudicated Y.T. dependent. A case plan for reunification was developed to address concerns with Mother's mental health, substance abuse, and housing.

{¶ 6} On May 2, 2025, CCDCFS filed a motion to modify temporary custody to permanent custody pursuant to R.C. 2151.413. The motion was supported by the affidavit of CCDCFS social worker, Marsherie Dandridge ("Dandridge") who attested that Mother (1) "has a substance abuse issue related to marijuana and

alcohol . . . has failed to consistently engage in recommended substance abuse treatment services and . . . failed to maintain her sobriety"; (2) "has failed to establish and maintain safe and appropriate housing"; and (3) "has three older children who were adjudicated neglected and/or dependent due in part to mother's mental health issues and lack of safe and appropriate housing." According to Dandridge's affidavit, Y.T.'s three older siblings were in the legal custody of other individuals.

{¶ 7} The matter proceeded to trial on November 14, 2025. On behalf of the agency, Dandridge testified that she was employed as a child-protection specialist with CCDCFS and was assigned to Y.T.'s case in December 2024. Dandridge's testimony established that a case plan for reunification was developed to assist Mother in addressing the agency's concerns. The case plan required Mother to (1) establish and maintain stable, safe, and appropriate housing for herself and Y.T.; (2) maintain an adequate income and budget to ensure Y.T.'s basic needs such as food, clothing, shelter, medical care and education were met; (3) live a lifestyle free of alcohol and drugs; (4) submit to random urine screens and a drug/alcohol assessment and comply with all recommendations made by service providers; (5) participate in and successfully complete all treatment including aftercare; and (6) comply with mental-health treatment. Parenting classes were later added due to observations by CCDCFS staff regarding deficiencies in Mother's interactions with Y.T.

{¶ 8} The record reflects that Mother successfully engaged with mental-health services and obtained appropriate medication and treatment such that her mental-health issues were resolved. Dandridge testified that she held no active concerns for Mother's mental health at the time of trial. (Tr. 30-31.) Similarly, Mother successfully completed parenting services to improve her handling of an infant and Dandridge testified that Mother was able to appropriately take care of Y.T. (Tr. 31, 49.)

{¶ 9} However, Dandridge's testimony established that Mother repeatedly failed to address her substance-abuse issues and had mixed results with her efforts to establish stable housing and provide for Y.T.'s basic needs. Amber Lathan ("Lathan"), a case coordinator for a treatment facility called People, Places, and Dreams, testified that Mother was diagnosed with severe alcohol-use disorder, severe stimulant-use disorder, and moderate cannabis-use disorder. (Tr. 65.) The testimony of both Dandridge and Lathan established that Mother repeatedly engaged with various substance-abuse treatment centers but consistently failed to complete her treatment programs. Although she completed a detox program at one facility, she chose to voluntarily terminate her subsequent intensive outpatient treatment at People, Places, and Dreams prior to the program's completion. (Tr. 67.) As a result, she was unable to be evaluated for aftercare or nonintensive outpatient treatment. (Tr. 69.) While Mother agreed to do a hair test for drug screening at Dandridge's request, she did not follow up to complete the testing. (Tr. 51.)

{¶ 10} For the case-plan goal of securing safe and appropriate housing and income, Mother did obtain housing in the month prior to trial. (Tr. 17.) However, there were no furnishings in the home and Mother failed to obtain employment or otherwise establish the ability to provide for Y.T.'s needs. (Tr. 17, 18.)

{¶ 11} Finally, the trial testimony established that Mother ceased visitations with Y.T. in the Fall of 2025 and had an ongoing, nearly four-month visitation gap, from her last visit on July 23, 2025, though the date of trial on November 14, 2025. When questioned about missed visits, Mother told Dandridge that "she has a lot going on or she had forgot to confirm the visitation schedule." (Tr. 32.) When Mother raised transportation as a potential visitation barrier, Dandridge provided Mother with bus tickets but she did not make use of them. (Tr. 33.)

{¶ 12} At the time of trial, Y.T. was residing with the foster family who he had resided with since less than a week after his birth. Dandridge testified that Y.T. was attached to his caregivers and is "a very playful, cheerful child, full of energy." (Tr. 34.) No other appropriate relative had been established as able to care for Y.T. (Tr. 36.) Y.T.'s current caregivers wished to move forward with adoption. (Tr. 15.)

{¶ 13} At the conclusion of trial, Y.T.'s guardian ad litem (the "GAL") submitted a report recommending permanent custody be granted in favor of CCDCFS. The GAL's report stated that "Mother is not currently involved in a recovery program, and has a history of leaving residential treatment programs of her own accord before she has completed the programs, and a history of relapsing with alcohol and marijuana." (GAL report at 6.) The GAL further stated, "Mother's

history shows that she is unable to change her behavior, keep a commitment to herself and the child, attend to the child's needs on a consistent basis or provide a stable[,] safe[,] healthy environment for the child. I have no reason to believe that she would be able to do these things if she had more time." (GAL report at 5.) The GAL concluded, "[I]t is in the child's best interest to remain in his current placement and for CCDCFS to plan for his adoption. Foster family is providing a stable, safe, peaceful home, are nurturing, and provide for his needs and more." (GAL report at 6.)

{¶ 14} On December 1, 2025, the juvenile court issued a journal entry granting the agency's motion for permanent custody, thereby terminating Mother's parental rights. This timely appeal followed.

## II. Law and Analysis

{¶ 15} In her sole assignment of error, Mother argues the juvenile court's judgment granting permanent custody to CCDCFS is against the manifest weight of the evidence.

{¶ 16} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child. *In re Murray*, 52 Ohio St.3d 155, 156 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997). However, this right is not absolute. It is

"'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 17} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hoffman*, 2002-Ohio-5368, ¶ 14; *In re Gill*, 2002-Ohio-3242, ¶ 21 (8th Dist.). It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 2015-Ohio-1028, ¶ 7 (8th Dist.), citing *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist. 1994). All children have "'the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 1986 Ohio App. LEXIS 7860, *5 (5th Dist. Aug. 1, 1986).

**1. Standard of Review**

{¶ 18} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence,

that any of the following factors apply: (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.  R.C. 2151.414(B)(1)(a)-(e).

{¶ 19} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).  Clear and convincing evidence is that measure or degree of proof, which is more than a mere preponderance of the evidence, but not to the extent of such certainty as is required beyond a reasonable doubt in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.  *In re Z.C.,* 2023-Ohio-4703, ¶ 7; *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

{¶ 20} The Supreme Court of Ohio clarified the standard of review in permanent custody cases, explaining:

[g]iven that R.C. 2151.414 requires that a juvenile court find by clear and convincing evidence that the statutory requirements are met, . . . the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review are the proper appellate standards of review of a juvenile court's permanent-custody determination, as appropriate depending on the nature of the arguments that are presented by the parties.

*In re Z.C.* at ¶ 11, 18 (holding remand was required where an appellate court applied the abuse-of-discretion standard).

{¶ 21} "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id*. at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

{¶ 22} With respect to Mother's challenges to the weight of the evidence supporting the juvenile court's judgment in this case, the Ohio Supreme Court has emphasized the importance of affording appropriate deference to the finder of fact, stating:

"In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." [*Eastley*] at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining

the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*Id.* at ¶ 14.

## 2. Analysis

{¶ 23} Here, the trial court made two findings under the first prong: (1) that Y.T. cannot be placed with Mother within a reasonable time or should not be placed with her, and (2) Y.T. was abandoned by Mother. Mother does not challenge the trial court's findings under the first prong, R.C. 2151.414(B)(1). Instead, Mother challenges the second prong, arguing that the court's finding that permanent custody is in the best interest of Y.T. under R.C. 2151.414(D) is against the manifest weight of the evidence.

{¶ 24} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.*, 2022-Ohio-356, ¶ 38 (10th Dist.), quoting *In re J.P.*, 2019-Ohio-1619, ¶ 39 (10th Dist.). "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors . . . to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 25} In this case, the juvenile court applied R.C. 2151.414(D)(1) and found, by clear and convincing evidence, "that it is in the best interest of the child to grant permanent custody to the agency."  R.C. 2151.414(D)(1) requires the juvenile court to consider all relevant factors in determining whether the child's best interests would be served by granting permanent custody.  These factors include (a) the interaction and interrelationship of the child with the child's parents; (b) the child's wishes, as expressed directly by the child or through the child's GAL; (c) the child's custodial history; (d) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (e) whether any of the factors set forth in R.C. 2151.414(E)(7)-(11) apply.  R.C. 2151.414(D)(1).

{¶ 26} A juvenile court must consider each of the R.C. 2151.414(D)(1) factors when making a permanent custody determination, but no one factor is given greater weight than the others.  *In re Schaefer*, 2006-Ohio-5513, ¶ 56.  The Ohio Supreme Court has held that "R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best interest factors in R.C. 2151.414(D)(1)(a) through (e).  Consideration is all the statute requires." *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 27} Mother argues that she "engaged substantially with her [case plan] services and has completed several objectives." (Appellant's brief at 9.)  Mother correctly points out that her mental-health concerns were resolved at the time of trial.  Mother argues that she completed parenting training but concedes she needs to reengage with regular visits.  Mother similarly argues that she obtained

appropriate housing but needs to fully furnish her home. Finally, Mother argues that she engaged with substance-abuse services and needs more time to complete intensive outpatient treatment and aftercare. Mother concludes that delaying the permanent-custody decision would allow her more time to re-engage and complete the case plan.

{¶ 28} We are unable to conclude that the juvenile court's best-interest findings are against the manifest weight of the evidence. Clear and convincing evidence supports the juvenile court's best-interest determination.

{¶ 29} First, with respect to the child's relationship with his parents, siblings, relatives, and foster parents under R.C. 2151.414(D)(1)(a), the evidence established that Mother did establish a bond with Y.T. However, this court has explained that "'the mere existence of a good relationship is insufficient. Overall, we are concerned with the best interest of the child, not the mere existence of a relationship.'" *In re K.M.*, 2011-Ohio-349, ¶ 23 (8th Dist.), quoting *In re R.N.*, 2004-Ohio-2560 (8th Dist.). "'[A] child's best interests require permanency and a safe and secure environment.'" *Id.*, quoting *In re Holyak*, 2001 Ohio App. LEXIS 3105, *10 (8th Dist. July 12, 2001). Here, the trial court noted that at the time of trial Mother had not visited Y.T. in more than 90 days despite efforts by CCDCFS to facilitate the visitations, including providing Mother with bus tickets that she chose not to use. The juvenile court cited this fact as the "most significant factor in this Court's decision." Conversely, the juvenile court found that, "[t]he child has been living with his foster family since his release from the hospital following his birth. He is bonded

with his foster family who wishes to adopt him. It is the only family he has even known."

{¶ 30} Under R.C. 2151.414(D)(1)(b), it is proper for the juvenile court to consider the GAL's recommendation where the child is too young to express their wishes. *In re M.D.*, 2022-Ohio-2672, ¶ 35 (8th Dist.). Here, the GAL recommended permanent custody be granted in favor of CCDCFS. Citing Mother's history of failure to complete substance-abuse treatment, the GAL concluded that Mother was unable to change her behavior and additional time would not lead to the resolution of her issues.

{¶ 31} Regarding the custodial history of the child under R.C. 2151.414(D)(1)(c), the juvenile court noted that the Y.T. had been in the custody of CCDCFS since April 24, 2024, just after his birth. Paternity was never established and no possible father was identified. Efforts to find and place the child with a relative were unsuccessful.

{¶ 32} Under R.C. 2151.414(D)(1)(d), the child's need for a legally secure permanent placement, the juvenile court found that the testimony of the witnesses at trial supported the GAL's conclusion that Mother was "unable to change her behavior, keep a commitment to herself and the child, attend to the child's needs on a consistent basis or provide a stable safe healthy environment." The court stated, "[M]other has not remedied the conditions that caused the removal of the child. She has been in at least four different drug treatment facilities since the beginning of 2025 and has not successfully completed any of them."

{¶ 33} Finally, under R.C. 2151.414(D)(1)(e) and (E)(10) the court noted that Mother had abandoned Y.T., having not visited him in over 90 days. The court held that this factor "weighs very heavily in favor of permanent custody." The only explanation offered by Mother was that she "[had] a lot going on." (Tr. 32.)

{¶ 34} After careful consideration of the record above, we conclude that the trial court's best interest determination in favor of permanent custody was not contrary to the manifest weight of the evidence.

{¶ 35} Accordingly, Mother's sole assignment of error is overruled.

{¶ 36} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

ANITA LASTER MAYS, J., and
KATHLEEN ANN KEOUGH, J., CONCUR