[Cite as *In re N.T.*, 2023-Ohio-1291.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

IN RE N.T., ET AL.                          :
                                            :        Nos. 111924 and 111925
Minor Children                              :
                                            :
[Appeal by D.L., Mother]                    :

---

**JOURNAL ENTRY AND OPINION**

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 20, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD19914398 and AD19914400

---

***Appearances:***

Wargo Law, LLC and Leslie E. Wargo, *for appellant*.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, P.J.:

{¶ 1} Mother-appellant, D.L. ("Mother"), appeals from the juvenile court's judgment granting permanent custody of her minor children, N.T. and J.T., to appellee, Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency"). Mother raises the following assignment of error for review:

The trial court erred when it awarded permanent custody to the agency as the decisions are against the manifest weight of the evidence and are not supported by clear and convincing evidence.

{¶ 2} After careful review of the record and relevant case law, we affirm the juvenile court's judgment.

## I. Procedural and Factual History

{¶ 3} Mother and Ju.T. ("Father 1") are the biological parents of the minor child, N.T. Mother and K.T. ("Father 2") are the biological parents of the minor child, J.T. Mother has two additional children, Na.L. and N.T., who are not the subject of this appeal.

{¶ 4} On December 2, 2019, CCDCFS filed a complaint for temporary custody, alleging that N.T. and J.T. were dependent children as defined in R.C. 2151.04(C). In support of the complaint, CCDCFS alleged the following set of particulars:

1. On or about November 27, 2019, Mother brought the children to CCDCFS and indicated that she could not provide for their daily needs at this time.

2. Mother does not have safe and stable housing in which to provide for the children. Mother has not had stable housing since approximately 2016.

3. Mother has previously been diagnosed with post-traumatic stress disorder and is in need of services to address her mental health.

4. Mother was previously convicted of child endangering and the children were the victims of the offense. *See* Garfield Heights M.C. No. CRB1902252.

5.  Father of N.T. and the alleged father of J.T.[1], [Father 1], is currently incarcerated serving a sentence of three years after convictions for burglary and attempted pandering of sexual materials involving minors.  He is not eligible for release until July 2021.

6.  [Father 1] has failed to establish paternity * * * and has failed to consistently support, visit, or communicate with the children since birth.

{¶ 5} In March 2020, the juvenile court issued separate journal entries finding the allegations of the complaint were proven by clear and convincing evidence.  Accordingly, N.T. and J.T. were adjudicated dependent and the matter was set for disposition.

{¶ 6} Approximately three weeks later, the juvenile court issued separate journal entries accepting Mother's stipulation to the requested disposition and committing N.T. and J.T. to the temporary custody of CCDCFS.  Thereafter, a case plan for reunification was developed to address the agency's concerns with Mother's undiagnosed mental-health issues, history of substance abuse, lack of stable housing, and inability to provide for the children's basic needs.  The case plan was later amended to include domestic-violence services.

{¶ 7} On October 9, 2020, CCDCFS filed a motion to modify the orders of temporary custody to orders of permanent custody pursuant to R.C. 2151.413.  The motion was supported by the affidavit of CCDCFS social worker, Kelly Williams ("Williams"), who averred, in pertinent part:

* * *

---

[1] Father 2 subsequently established paternity of J.T. and was joined in the proceedings.

6. A case plan was filed with the juvenile court and approved which required that Mother demonstrate the ability to meet the children's needs for food, stable housing, supervision, and nurturing; complete a psychological evaluation and follow any and all recommendations; complete a drug and alcohol assessment and follow any and all recommendations.

7. Mother lacks stable and appropriate housing.

8. Mother only recently engaged in mental health services, and has failed to show that she is benefiting from said services.

9. Mother continues to use marijuana, and has failed to obtain a drug and alcohol assessment.

10. Mother has failed to submit genetic testing to help establish paternity for * * * J.T.

11. Mother is in a domestically violent relationship with her current paramour, which has resulted in her being evicted from her residence.

12. A case plan was filed with the juvenile court and approved which required [Father 1] establish paternity.

13. [Father 1] is currently incarcerated[.]

{¶ 8} A permanent custody hearing was held on June 24, 2022. At the hearing, Williams testified that she was formally employed as an extended caseworker at CCDCFS and was assigned to the children's case in January 2020. Williams outlined her familiarity with the Mother and the circumstances that caused the children to be removed from her care in December 2019. Specifically, Williams testified that the agency obtained emergency temporary custody of the children because Mother self-reported having unstable housing and feeling overwhelmed.

{¶ 9} Williams testified that a case plan for reunification was developed to assist Mother in addressing the issues that led to the children's removal. As

previously discussed, Mother's case plan required her to obtain stable housing, complete a domestic-violence program, complete mental-health and substance-abuse assessments, and comply with any additional recommended services. In pertinent part, the case plan required Mother to (1) complete a psychological evaluation and engage in any recommended services; (2) complete a drug and alcohol assessment, engage in any recommended services, and submit to scheduled and random drug screens as requested by the agency; (3) establish paternity and provide financial and emotional support to the children; and (4) "demonstrate an ability to meet the children's needs for food, stable housing, supervision, and nurturing by using [her] own income and community resources."

{¶ 10} Williams testified that during the time she was assigned to the children's case, Mother failed to establish stable housing and did not demonstrate the ability to meet the children's basic needs. The record reflects that in August 2019, Mother was convicted of child endangering in the Garfield Heights Municipal Court. By November 2019, Mother was homeless and contacted CCDCFS because she had nowhere to go with the children. After the children were placed in the emergency care of the agency, Mother obtained suitable housing for a period of three months in the summer of 2021. However, following an incident of domestic abuse involving her then boyfriend, Marquis Thomas ("Thomas"), Mother was evicted from the home by her landlord. As a result of the incident, Mother began residing at a woman's shelter, Zelie's Home, in September 2021. Mother resided in Zelie's

Home for approximately ten months. During this time period, the children were prohibited from residing with Mother in the shelter.

{¶ 11} Mother moved out of the shelter and into independent housing approximately 11 days before the permanent-custody hearing. Despite Mother's efforts, Williams had ongoing concerns with Mother's ability to maintain suitable housing because Mother (1) did not provide financial support to the children during the pendency of the case, (2) did not provide verification of employment during the pendency of the case, and (3) was unemployed at the time of the permanent custody hearing. Williams was further concerned with the amount of time it took Mother to find suitable housing, stating, in relevant part:

> [I]t doesn't take people two years to find housing. * * * You know, she's filed the taxes for the kids. * * * So you have money to get something, but you haven't been able to hold a job. It's going to take you being fully employed to be able to maintain your children. There's available daycare, but again, you're going to have to, you know, be able to maintain that.
>
> * * *
>
> Mom is young, she's under 25 and to maintain, you know, meet the needs of the kids, the basic needs of them, you know, she's been out of housing for five years. That's going to be something to maintain housing for somebody who hasn't had housing for five years.

(Tr. 68-69, 71.)

{¶ 12} Williams testified that Mother's case plan was amended to include services for domestic abuse following the incident of domestic violence with Thomas in 2021. Mother was required to "attend and participate in domestic violence services," and "demonstrate that she is able to keep herself and children safe from

[domestic violence] concerns." Williams confirmed that Mother completed a domestic-violence class while residing at the shelter, and there have been no new reported incidents of domestic violence. Nevertheless, Williams testified that the agency had ongoing concerns with domestic violence during the pendency of the case because Mother continued to have contact with Thomas and, in fact, got pregnant with Thomas's child while residing in Zelie's Home.

{¶ 13} Regarding the substance-abuse component of the case plan, Williams clarified that Mother was required to complete a substance-abuse referral because she "admitted to marijuana use" and tested positive for marijuana in February 2020. (Tr. 19, 25.) Mother was initially referred to Catholic Charities for a substance-abuse assessment in 2020, but she failed to appear for her scheduled appointment. Mother was subsequently referred for a substance-abuse assessment at New Visions, which she completed in November 2020. A certified copy of Mother's records from New Visions, marked exhibit No. 1, reflects that Mother was diagnosed with cannabis use disorder and outpatient services were recommended. Mother tested positive for alcohol use in February 2021, and was discharged from New Visions in March 2021 due to noncompliance with recommended treatment. After being discharged by New Visions, Mother failed to engage in substance-abuse treatment and did not consistently submit to random drug screens requested by the agency.

{¶ 14} In January 2022, Mother completed a second assessment through New Visions. On this occasion, New Visions did not recommend any additional

substance-abuse services because Mother provided a negative drug test and reported being sober for a period of one year. Approximately one month later, Mother submitted to a hair-follicle drug test that was administered by the agency. Williams confirmed that hair follicle test came back negative. Nevertheless, Williams opined that Mother did not successfully complete her case-plan objectives for substance and alcohol abuse because she did not successfully engage in previously recommended services and did not have a documented sobriety date based on her failure to consistently submit to random drug screens during the pendency of the custody proceedings. (Tr. 46-47, 73-75.)

{¶ 15} Williams testified that mental-health components were included in Mother's case plan because she has a history of depression and "suicidal ideations." (Tr. 26.) Mother was initially referred for a mental-health assessment at Ohio Guidestone in May 2020. She was diagnosed with a general anxiety disorder, post-traumatic stress disorder, and major-depressive disorder. Based on these issues, Ohio Guidestone recommended that Mother engage in psychotherapy, therapeutic behavioral services or psychosocial rehabilitation, and psychiatry services. In August 2021, however, Mother was discharged from Ohio Guidestone due to noncompliance. During Mother's second substance-abuse assessment with New Visions in January 2022, it was recommended that Mother "complete a full mental health assessment." (Tr. 30-31.) However, Mother refused to comply with the recommendation because she did not believe it was necessary or effective. Thus, Williams expressed that the agency had ongoing concerns with Mother's mental

health because "she has not been consistent with mental health services" and continues to exhibit signs of depression. (Tr. 31.)

{¶ 16} With respect to visitation, Williams testified that between December 2019, and September 2021, Mother's visitation with the children was inconsistent and sporadic. At one point, the agency was not "having visits again because mom wasn't showing up and, you know, she didn't have housing and things like that." (Tr. 39.) It was only when Mother moved into Zelie's Home, and the children were being transported directly to the shelter, that Mother's unsupervised visits became more consistent and appropriate. However, Williams indicated that Mother's interaction with the children was limited to the scheduled visits. Williams testified that Mother does not consistently attempt to communicate with the children via telephone or FaceTime despite having the ability and access to do so.

{¶ 17} Father 1 was incarcerated at the time of the children's removal, and remained in custody during a substantial portion of the proceedings. Williams testified that Father 1 was released from prison in late 2021, or early 2022, but was subsequently reincarcerated until April 2022. Williams testified that Father 1 has had no involvement with N.T. and did not attempt to visit her when he was out of prison. At the time of the hearing, Father 1 was between jobs and, due to the nature of his previous convictions, was "not able to provide care for [N.T.]" (Tr. 82.)

{¶ 18} Father 2 was joined in the proceedings after it was established that he is the biological father of J.T. Williams testified that Father 2 initially expressed interest in obtaining custody of J.T., and visited J.T. on several occasions. However,

Father 2 did not actively communicate with J.T., did not provide financial support, and eventually expressed that he was not interested in engaging in recommended services. Williams further testified that the agency attempted to identify suitable relatives for placement. Their efforts, however, proved unsuccessful.

{¶ 19} Williams testified that J.T. is adjusting well to his placement in foster care. J.T. resides in the foster home with his sister, Na.L., and has formed a bond with his sister and his foster parents. Williams testified that J.T. is actively participating in counseling through Ohio Guidestone and is having his individual needs met. N.T., however, was removed from her placement before the permanent custody hearing due to behavioral issues in school and her foster home. N.T. is currently placed in a residential facility where she is receiving services to address her significant behavioral issues and mental-health needs.

{¶ 20} Based on the foregoing, Williams testified that she did not believe the children could be reunified with their parents and that permanent custody was in their best interests. She explained her position as follows:

> The children have been in care since 2020. There has been no progress with the mom, no consistency with her being able to hold a job, addressing her mental health. I've spent a lot of time trying to work with her to do services. I've linked her to two community collabs as a support to help her through things and, you know, but mom just didn't get there.

(Tr. 44.)

{¶ 21} Child protection specialist, Sierra Whatley ("Whatley"), testified that she was assigned to the children's case in May 2022. Whatley confirmed that

Mother moved into "an appropriate home" on June 13, 2022, and had lived on her own for less than one week. (Tr. 88.) Whatley further confirmed that Mother is not currently employed and failed to complete "the full mental health assessment that was recommended by New Visions." (Tr. 81.) Whatley also discussed the children's current placements. She reiterated that N.T. is currently placed in a residential facility and is receiving individual and group counseling. In turn, J.T. is currently placed in a foster home with another sibling, "appears pretty bonded" with his foster parents, and is actively improving his social skills. (Tr. 84.) When asked whether she believed permanent custody was in the children's best interests, Whatley stated as follows:

> The agency believes that permanent custody is in the children's best interests at this time. The kids have been in custody for over two and a half years. There is a concern with [Mother] maintaining her mental health and also maintaining housing. She did just get housing last week, but she has a history of unstable housing and unemployment. So the concern is just her being able to maintain her mental health and housing.

(Tr. 84-85.)

{¶ 22} Mother testified on her own behalf. She confirmed her understanding of her case-plan objectives and her obligation to engage in services related to mental health, substance abuse, housing, and domestic violence. Mother testified that she is currently renting a unit of a home located in Cleveland, Ohio. Mother was approved for Section 8 housing in January 2022, but was unable to find suitable housing until June 2022 because she does not "have good credit." (Tr. 104.) Mother confirmed that she did not have employment at the time of the permanent-custody

hearing but intended to schedule an interview with her former employer. Mother expressed that she was capable of providing for her children and will to do whatever is necessary to "keep [her] kids safe." (Tr. 107.) Mother stated that she intends to engage in the programming offered by Zelie's Home, including services for financial literacy, parenting classes, and resource assistance.

{¶ 23} Regarding the substance-abuse component of her case plan, Mother testified that she was required to submit to random drug screens at Zelie's Home as a condition of her residency. Mother explained that she "[doesn't] have a substance abuse problem" and made the decision to stop using marijuana because it was interfering with her ability to "get [her] kids back." (Tr. 98.) Mother indicated that she did not engage in outpatient substance-abuse treatments because New Visions did not recommend any additional services following her assessment in 2022.

{¶ 24} While living in the shelter, Mother also engaged in mental-health counseling and developed a strong bond with her counselor. Mother testified that she also spoke with a doctor at MetroHealth Hospital and has consistently taken anxiety medication since October 2021. Mother testified that she advised the agency that she was engaging in mental-health services through the shelter and was taking medication as prescribed by her treating physicians. Yet, Mother acknowledged that she did not comply with New Visions recommendation that she complete a full mental-health assessment. She explained the basis of her decision to ignore the recommendation as follows:

I didn't feel like I needed to take another mental health assessment when I already took one in September when I started engaging in counseling services through their agency, at Zelie's Home.

(Tr. 98.)

{¶ 25} At the conclusion of her testimony, Mother requested that her children be returned to her care, stating:

Nobody can care for my kids how I care for my kids. I don't care how anybody make it seem. I don't care how anybody try to make it seem like I'm a bad person. Nobody is going to love them or take care of them the way that I can. Nobody is going to understand them the way that I can.

(Tr. 111.).

{¶ 26} Finally, the court heard from the child's guardian ad litem, Alix Wintner, Esq. (the "GAL"). Consistent with the recommendations of the agency's employees, the GAL recommended that permanent custody be granted in favor of CCDCFS. The GAL summarized her position as follows:

This has been a very, very hard case for me. I've been involved since the beginning. I mean, mom has kind of gone through ups and downs, good periods and not so good periods.

She's done I think great since she's been at Zelie's Home, but at Zelie's Home there's a lot of oversight and people there to make sure that the mothers take responsibility. In the two and a half years mom's really only had her own place for about three months and that didn't go so well. She was eventually evicted from the place and there were issues.

I think that [N.T.] has a lot of behavioral problems. She's very young. She's six years old and I've never heard of a six-year-old being in a residential treatment before. That to me – because it's so unusual – it's very, very serious. And I know that mother loves her kids and that she would do what she could for them, but I don't think that even a mother's love can fix the problems that this young child has.

In the last year mom's been very consistent with her visits. I've been to several of them. They've gone well. She's attentive to the children. And if we were only one year into this case I would not be recommending permanent custody, but because there are time limits on these cases I'm concerned about mom being able to meet the needs of the children, to maintain housing because there isn't a history, a good history of maintaining housing or employment. I mean, mom's baby was born in December and there could have been employment during this interim period.

So I'm not happy with having to recommend this, but I am recommending that permanent custody be granted of these two children.

(Tr. 119-120.)

{¶ 27} In separate journal entries, the juvenile court granted the agency's motion for permanent custody of N.T. and J.T. The court found, by clear and convincing evidence, that a grant of permanent custody was in the children's best interests and that the children cannot be placed with either of their parents within a reasonable time or should not be placed with either parent.

{¶ 28} Mother now appeals from the juvenile court's judgment.

## II. Law and Analysis

{¶ 29} In the sole assignment of error, Mother argues the juvenile court's judgment awarding the agency permanent custody of N.T. and J.T. is against the manifest weight of the evidence and is not supported by clear and convincing evidence. Mother contends that the evidence adduced at the permanent custody hearing established that she (1) "successfully met the substance abuse plan goal by obtaining and maintaining sobriety for a period longer than eight months," (2) "has remained consistent with her medication and counseling" since residing in Zelie's

Home, (3) "secured appropriate housing in June of 2022," and (4) successfully "completed a domestic violence class while she was at Zelie's Home."

{¶ 30} We take our responsibility in reviewing cases involving the termination of parental rights and the award of permanent custody very seriously. A parent has a "'fundamental liberty interest' in the care, custody and management" of his or her child, *In re Murray*, 52 Ohio St.3d 155, 156, 556 N.E.2d 1169 (1990), quoting *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and the right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 8th Dist. Cuyahoga No. 101390, 2015-Ohio-314, ¶ 67, quoting *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). However, this right is not absolute. It is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, 86 N.E.3d 1012, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979).

{¶ 31} Because the termination of parental rights is "'the family law equivalent of the death penalty in a criminal case,'" it is "an alternative [of] last resort." *In re J.B.*, 8th Dist. Cuyahoga No. 98546, 2013-Ohio-1704, ¶ 66, quoting *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14; *In re Gill*, 8th Dist. Cuyahoga No. 79640, 2002-Ohio-3242, ¶ 21. It is, however, "sanctioned when necessary for the welfare of a child." *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 7, citing *In re Wise*, 96 Ohio App.3d 619, 624, 645 N.E.2d 812 (9th Dist.1994). All children have "'the right, if possible, to

parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.* at ¶ 66, quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102, 696 N.E.2d 1090 (8th Dist.1996). When parental rights are terminated, the goal is to create "a more stable life" for dependent children and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67, citing *In re Howard*, 5th Dist. Tuscarawas No. 85 A10-077, 1986 Ohio App. LEXIS 7860, 5 (Aug. 1, 1986).

## A. Standard of Review

{¶ 32} R.C. 2151.414 provides a two-prong analysis to be applied by a juvenile court in adjudicating a motion for permanent custody. *In re S.C.*, 2018-Ohio-2523, 115 N.E.3d 813, ¶ 20 (8th Dist.), citing R.C. 2151.414(B). This first prong of this statute authorizes the juvenile court to grant permanent custody of a child to the public agency if, after a hearing, the court determines, by clear and convincing evidence, that any of the following factors apply (a) the child is not abandoned or orphaned, but the child cannot be placed with either parent within a reasonable time or should not be placed with the child's parents; (b) the child is abandoned; (c) the child is orphaned, and there are no relatives of the child who are able to take permanent custody; (d) the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has

been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state. R.C. 2151.414(B)(1)(a)-(e).

{¶ 33} In accordance with the second prong of R.C. 2151.414, when any one of the above factors exists, the juvenile court must then analyze whether, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency pursuant to R.C. 2151.414(D).

{¶ 34} "A juvenile court's decision to grant permanent custody will not be reversed as being against the manifest weight of the evidence 'if the record contains some competent, credible evidence from which the court could have found that the essential statutory elements for permanent custody had been established by clear and convincing evidence.'" *In re G.W.*, 8th Dist. Cuyahoga No. 107512, 2019-Ohio-1533, ¶ 62, quoting *In re A.P.*, 8th Dist. Cuyahoga No. 104130, 2016-Ohio-5849, ¶ 16. "'Clear and convincing evidence' is evidence that 'will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established.'" *In re T.B.*, 8th Dist. Cuyahoga No. 99931, 2014-Ohio-2051, ¶ 28, quoting *Cross v. Ledford*, 161 Ohio St. 469, 477, 120 N.E.2d 118 (1954).

### B. First Prong: R.C. 2151.414(B)(1)(a)-(e)

{¶ 35} With respect to the first prong of the permanent-custody analysis, the juvenile court found, pursuant to R.C. 2151.414(B)(1)(a), that the children were neither abandoned nor orphaned, but they could not be placed with either parent within a reasonable time or should not be placed with their parents.

{¶ 36} When assessing whether a child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents under R.C. 2151.414(B)(1)(a), a juvenile court must consider the factors outlined in R.C. 2151.414(E). *In re A.V.*, 8th Dist. Cuyahoga No. 101391, 2014-Ohio-5348, ¶ 58; *In re R.M.*, 8th Dist. Cuyahoga Nos. 98065 and 98066, 2012-Ohio-4290, ¶ 14; *In re B.P.*, 8th Dist. Cuyahoga Nos. 107732 and 107735, 2019-Ohio-2919, ¶ 13. A juvenile court is only required to find that one of these factors is met in order to properly find that a child cannot or should not be placed with a parent. *In re Ca.T.*, 8th Dist. Cuyahoga No. 108969, 2020-Ohio-579, ¶ 27, citing *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 42.

{¶ 37} In this case, the juvenile court found, pursuant to R.C. 2151.414(E)(1), that

> [f]ollowing the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home.

{¶ 38} The court further found, pursuant to R.C. 2151.414(E)(13) that

> [t]he parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.

{¶ 39} After careful consideration, we find competent and credible evidence supports the juvenile court's determination that the children clearly and convincingly could not or should not be placed with either parent within a reasonable time.

{¶ 40} In reaching this conclusion, we acknowledge that Mother's substance-abuse issues are not as concerning as they were during the early stages of these proceedings. (Tr. 89-90.) Although Mother's refusal to comply with her obligation to "provide drug screens requested by the agency" was unwarranted, it is worth noting that Mother has passed all drug screens administered since February 2020, and her latest substance-abuse assessment did not recommend further outpatient services. The record further reflects that Mother successfully completed a domestic-violence class in 2022 and has not engaged in an incident of domestic-violence since completing the course. Finally, there is no dispute that Mother has worked to improve her credit and obtained appropriate and suitable housing approximately 11 days before the permanent-custody hearing. Mother's efforts in these areas are to be commended.

{¶ 41} With that stated, however, we find the record equally reflects that Mother failed to complete significant portions of her case plan and, therefore, failed to substantially remedy the conditions that caused the children to be removed from her home. Here, Williams explained that the children were removed from Mother's custody after Mother reported to the agency that she was homeless and overwhelmed by depression. (Tr. 18.) Thus, it is evident that Mother's mental-health issues, her history of unstable housing, and her inability to provide for the children's basic needs were of primary significance to CCDCFS.

{¶ 42} To address these concerns, the agency developed a case plan that expressly required Mother to compete a mental-health evaluation and follow

through with any and all additional services that are recommended or deemed beneficial. In addition, Mother was required to "demonstrate an ability to meet the children's need for food, stable housing, supervision, and nurturing by using her own income and community resources."

{¶ 43} In this case, the record confirms that Mother was discharged from Ohio Guidestone after she failed to comply with its recommendation that she engage in psychotherapy, therapeutic behavioral services or psychosocial rehabilitation, and psychiatry services. Furthermore, Mother did not dispute that she knowingly refused to comply with New Visions's recommendation in 2022 that she complete a full mental-health assessment as contemplated in the mental-health component of her case plan. Mother was not relieved of her obligations under the case plan merely because she felt an additional assessment was redundant or unnecessary. According to Williams, Mother was not consistent with her mental-health services and continued to exhibit signs of depression throughout the pendency of this case. Although Mother's case manager at Zelie's Home indicated that Mother had engaged in counseling services while residing at the shelter, the agency was not provided with documentation to confirm whether Mother completed a full mental-health assessment or otherwise engaged in recommended services. For these reasons, Williams maintained that Mother has not engaged in "appropriate therapy" and did not adequately address the agency's ongoing concerns with her mental health. (Tr. 28, 70-71.)

{¶ 44} In turn, the record further supports the juvenile court's conclusion that Mother has not demonstrated the ability to maintain stable housing or provide for the children's basic needs. Preliminarily, we find the record supports Williams's testimony that Mother often did not appreciate what was necessary for reunification with her children. (Tr. 67-68.) For instance, despite the circumstances that caused the children's removal in the first place, including a conviction for child endangering, Mother expressed that if the children were returned to her, she would care for them the same way she did before they were placed in the agency's emergency custody. (Tr. 108, 113.) Williams testified that Mother also minimized N.T.'s behavioral and mental-health issues, and was reluctant to change her mindset when it came to compliance with her case-plan objectives.

{¶ 45} Moreover, without delving into Williams's justified concerns with the amount of time it took Mother to obtain housing, we emphasize that Mother has been unemployed for a substantial period of time and has not demonstrated a stable source of income that is enough to provide for the children's needs. Mother's efforts to secure an appropriate home through the programming offered by Zelie's Home is significant. At this point, however, Mother's securement of a lease is not necessarily indicative of her ability to provide for the children's basic needs and *maintain* stable housing. As contemplated under the plain language of Mother's case plan, Mother's ability to satisfy this component of her case plan required her to "work or show a stable source of income that is enough to provide for the family's need. The income will be budgeted to meet the needs of the household effectively." When asked to

describe her employment situation, Mother stated that she was trying to find a job that best suits her and that she stopped working because it was not in her best interests, and she was "already getting help from Zelie's Home." (Tr. 103.) Mother's suggestion that she intended to obtain employment once she was settled into her home did not overcome the various circumstances supporting the court's conclusion that she "still had not demonstrated that ability to maintain stable housing * * * and remains unable to meet the children's basic needs."

{¶ 46} Finally, even if this court were to accept Mother's position that she substantially complied with her case plan by engaging in services at Zelie's Home, we note that Ohio courts have routinely held that a parent's compliance with his or her case plan is not necessarily dispositive on the issue of reunification. *See In re F.T.*, 4th Dist. Ross No. 22CA17, 2023-Ohio-191, ¶ 64, citing *In re B.P.*, 4th Dist. Athens No. 20CA13, 2021-Ohio-3148, ¶ 57; *In re T.J.*, 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163, ¶ 36, citing *In re R.L.*, 9th Dist. Summit Nos. 27214 and 27233, 2014-Ohio-3117, ¶ 34 ("[A]lthough case plan compliance may be relevant to a trial court's best interest determination, it is not dispositive of it."); *In re S.C.*, 8th Dist. Cuyahoga No. 102349, 2015-Ohio-2280, ¶ 40 ("Compliance with a case plan is not, in and of itself, dispositive of the issue of reunification."); accord *In re K.M.*, 4th Dist. Ross No. 19CA3677, 2019-Ohio-4252, ¶ 70, citing *In re W.C.J.*, 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, ¶ 46 ("Substantial compliance with a case plan is not necessarily dispositive on the issue of reunification and does not preclude a grant of permanent custody to a children's services agency."); *In re N.L.*,

9th Dist. Summit No. 27784, 2015-Ohio-4165, ¶ 35 ("[S]ubstantial compliance with a case plan, in and of itself, does not establish that a grant of permanent custody to an agency is erroneous."). "Indeed, because the trial court's primary focus in a permanent custody proceeding is the child's best interest, 'it is entirely possible that a parent could complete all of his/her case plan goals and the trial court still appropriately terminate his/her parental rights.'" *W.C.J.* at ¶ 46, quoting *In re Gomer*, 3d Dist. Wyandot Nos. 16-03-19, 16-03-20, and 16-03-21, 2004-Ohio-1723, ¶ 36; accord *In re K.J.*, 4th Dist. Athens No. 08CA14, 2008-Ohio-5227, ¶ 24 ("[W]hen considering a R.C. 2151.414(D)(1)(d) permanent custody motion, the focus is upon the child's best interests, not upon the parent's compliance with the case plan."). Consequently, even if Mother complied with her case plan requirements, her compliance, standing alone, did not necessarily demonstrate that she substantially remedied the conditions that caused the children's removal or that reunification is in the children's best interest.

{¶ 47} Based on the foregoing, we find the record clearly and convincingly supports the juvenile court's conclusion that Mother was not amenable to various services and failed to remedy the conditions that caused the children to be placed outside the home. Standing alone, this evidence is sufficient to satisfy the first prong of the two-part analysis.[2] *See In re M.S.K.*, 8th Dist. Cuyahoga No. 111974, 2023-Ohio-316, ¶ 31 ("Pursuant to R.C. 2151.414(E), if the court determines, by clear and

---

[2] Briefly, as it pertains to Father 1, the record unambiguously demonstrates that he was repeatedly incarcerated and unable to care for his biological child.

convincing evidence, that one or more of the (E)(1)-(15) factors exist, the court *shall* enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent."). (Emphasis sic.) Accordingly, the juvenile court appropriately found that N.T. and J.T. could not or should not be placed with Mother within a reasonable time pursuant to R.C. 2151.414(B)(1)(a)

### C. Second Prong: Best Interests of the Children

{¶ 48} Turning to the second prong of the permanent-custody analysis, we recognize "[t]he discretion that the juvenile court enjoys in [deciding] whether an order of permanent custody is in the best interest of a child should be accorded the utmost respect, given the nature of the proceeding and the impact the court's [decision] will have on the lives of the parties concerned." *In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424 (8th Dist.1994). Thus, we review a juvenile court's determination of a child's best interests under R.C. 2151.414(D) for abuse of discretion. *In re D.A.*, 8th Dist. Cuyahoga No. 95188, 2010-Ohio-5618, ¶ 47.

{¶ 49} An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse ""implies that the court's attitude is unreasonable, arbitrary or unconscionable."" *State v. Montgomery*, Slip Opinion No. 2022-Ohio-2211, ¶ 135, quoting *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980). This court has held that an abuse of discretion may be found where a trial court "applies the

wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact." *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.). When applying the abuse-of-discretion standard, a reviewing court may not substitute its judgment for that of the trial court. *Vannucci v. Schneider*, 2018-Ohio-1294, 110 N.E.3d 716, ¶ 22 (8th Dist.).

{¶ 50} "In determining the best interest of a child, a juvenile court 'may apply one of two different tests.'" *In re S.C.,* 10th Dist. Franklin No. 21AP-203, 2022-Ohio-356, ¶ 38, quoting *In re J.P.*, 10th Dist. Franklin No. 18AP-834, 2019-Ohio-1619, ¶ 39. "'Under R.C. 2151.414(D)(1), the juvenile court weighs multiple factors * * * to decide whether granting an agency permanent custody of a child is in that child's best interest.'" *Id.*, quoting *In re J.P.* at ¶ 39. "By contrast, 'under R.C. 2151.414(D)(2), if the juvenile court makes [each of] the four enumerated findings, permanent custody is per se in the child's best interest and the court "shall" commit the child to the permanent custody of the agency.'" *Id.*, quoting *In re J.P.* at ¶ 39. "These two provisions 'are alternative means for reaching the best-interest determination.'" *Id.*, quoting *In re J.P.* at ¶ 40.

{¶ 51} In this case, the juvenile court applied R.C. 2151.414(D)(1), and expressly considered the following factors in finding that a grant of permanent custody in favor of CCDCFS was in the children's best interest:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1).

{¶ 52} Although a juvenile court is required to consider each relevant factor under R.C. 2151.414(D)(1), "there is not one element that is given greater weight than the others pursuant to the statute." *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56. Moreover, the Ohio Supreme Court has clarified that R.C. 2151.414(D)(1) does not require a juvenile court to expressly discuss each of the best-interest factors in R.C. 2151.414(D)(1)(a) through (e). "Consideration is all the statute requires." *In re A.M.*, 166 Ohio St.3d 127, 2020-Ohio-5102, 184 N.E.3d 1, ¶ 31.

{¶ 53} After careful consideration of the testimony presented at the permanent custody hearing, we find there is competent, credible evidence in the record to support the juvenile court's reliance on the factors set forth under R.C. 2151.414(D) and its conclusion that permanent custody to the agency is in children's best interests.

{¶ 54} First, with respect to the children's relationship with their parents, siblings, relatives, and foster parents, there is no dispute that the children do not share a relationship with their biological fathers. The record further reflects that N.T. and J.T. have had vastly different experiences in their temporary placement. Williams testified that J.T. has formed a significant bond with Na.L. and his foster parents. His basic needs are being met and he is actively engaged in counseling services through Ohio Guidestone. In contrast, N.T.'s behavior appears to have worsened since her removal from Mother's care. She began exhibiting aggressive and sexualized behaviors that required CCDCFS to place her in a residential facility. N.T. is currently engaged in counseling services to address her behavioral and mental-health issues.

{¶ 55} Regarding Mother, the agency workers assigned to this case agreed that Mother loves her children deeply and has engaged in appropriate visits with the children since living in Zelie's Home. Nevertheless, the GAL and Williams each opined that Mother's loving relationship with her children, standing alone, is not indicative of her ability to provide for children's basic needs. (Tr. 68, 119-120.) *See In re K.M.*, 8th Dist. Cuyahoga No. 95374, 2011-Ohio-349, ¶ 23 (The best interest of the child requires permanency and a safe, secure environment, and the mere existence of a good relationship is insufficient.). Williams further described inconsistent aspects of Mother's relationship and interaction with N.T. and J.T. She explained that prior to Mother's residence in Zelie's Home, Mother's visitation was sporadic and she frequently failed to show up for scheduled visits. Mother was also

reluctant to contact the children outside scheduled visits and did not consistently attempt to contact them or their foster parents via telephone or FaceTime.

{¶ 56} Under R.C. 2151.414(D)(1)(b), it is proper for the juvenile court to consider the GAL's recommendation where the children are too young to express their wishes. *In re M.D.*, 8th Dist. Cuyahoga Nos. 110957, 110958, and 110959, 2022-Ohio-2672, ¶ 35. Here, N.T. was six-years old and J.T. was four-years old at the time of the permanent custody hearing. Although the children did not formulate a meaningful expression of their wishes at the custody hearing due to their age, the GAL spoke on the children's behalf and recommended permanent custody to CCDCFS. Noting the children's need of legally secure permanent placement and Mother's history of unstable housing and employment, the GAL believed that permanent custody was in the children's best interests.

{¶ 57} Regarding the (D)(1)(c) and (d) factors, there is no dispute that the agency was unable to identify a suitable relative for placement and that the children have remained in the agency's custody since December 2019. *See* R.C. 2151.415(D). Mother had approximately two and a half years to take the necessary steps to remedy the substantial issues that caused the children to be removed from her care. Although Mother has addressed certain issues that have negatively affected her in the past, her reluctance to follow the recommendations of the agency and her

service-providers prohibited her from demonstrating her ability to provide the children with a permanent and stable home. [3]

{¶ 58} Balancing the foregoing factors and the recommendations of the GAL and agency employees, the juvenile court was free to conclude that the ultimate welfare of the children would be better served by an award of permanent custody. CCDCFS provided credible evidence regarding the children's custodial history, their need for legally secure permanent placement, and the significant hurdles Mother has yet to overcome. Viewing the evidence collectively, we cannot say that the

---

[3] Citing an earlier case from this court, Mother contends that the juvenile court's determination rests "more on possibilities than clear and convincing evidence[.]" *In re M.S.,* 2015-Ohio-1847, 34 N.E.3d 420, ¶ 59 (8th Dist.). Consistent with the foregoing discussion, we find *In re M.S.* contains highly distinguishable facts. There, father appealed from the trial court's judgment granting permanent custody. In analyzing the best interest of the children, this court found the factors under R.C. 2151.414(D)(1)(a) and (b) clearly weighed in favor of preserving the family relationship despite domestic-violence issues: the children had a strong, loving relationship with appellant; he had constant visitations with the children; there were no concerns regarding his interactions with them; and the children had expressed a desire to be with him. Regarding the (D)(1)(d) factor, this court noted that father had taken significant steps toward completing the case plan and remedying the conditions that had caused the children's removal and, at one point, appellant came very close to reunification with his children. The evidence also showed father consistently followed up with services, obtained schooling and daycare for the children, and took care of the children and their needs. Consequently, this court found no clear and convincing evidence existed to show that a legally secure permanent placement cannot be achieved without a grant of permanent custody.

In contrast, the record in this case does not reflect that Mother has consistency followed up with recommended services or taken significant steps towards completing her case plan objectives. As stated, Mother admittedly failed to obtain a verifiable source of income, failed to submit to requested drug screens with the agency, failed to complete a recommended mental-health assessment, and failed to document her participation in recommended mental-health services. This court's decision in *In re M.S.* was predicated on the specific facts present in that case and it does not support a reversal here.

juvenile court acted unreasonably, arbitrarily, or unconscionably in determining that permanent custody was in the best interests of N.T. and J.T.

{¶ 59} Mother's sole assignment of error is overruled.

### III. Conclusion

{¶ 60} The juvenile court's award of permanent custody to CCDCFS is supported by clear and convincing evidence in the record and is not against the manifest weight of the evidence. Accordingly, Mother's sole assignment of error is overruled.

{¶ 61} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, PRESIDING JUDGE

EMANUELLA D. GROVES, J., and
MICHAEL JOHN RYAN, J., CONCUR